541 F.2d 346
 The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company ("AT&T") et al., Intervenors.
 No. 75-1796.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1976.
Decided July 28, 1976.
 
 Wm. Warfield Ross, William R. Weissman, J. Michel Marcoux, Wald, Harkrader & Ross, Jack Werner, Joel Yohalem, Laurence Singer, Washington, D.C., for petitioner; Richard C. Hostetler, Vice President and Gen. Counsel, Western Union Telegraph Co., Upper Saddle River, N.J., of counsel.
 Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Counsel, F.C.C., Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, John Powers, Dept. of Justice, Washington, D.C., for respondents.
 Charles A. Horsky, E. Edward Bruce, Stephen G. Ryan, Gary L. Reback, Covington & Burling, Washington, D.C., Alfred C. Partoll, Lee S. Cutcliff, M. Jean Dabney, New York City, for intervenors; F. Mark Garlinghouse, New York City, of counsel.
 Before SEITZ, Chief Judge, and ALDISERT and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This petition for review of an order of the Federal Communications Commission presents issues concerning the scope and applicability of exchange of facilities contracts in force between Western Union (WU) and American Telephone and Telegraph (AT&T). The Commission concluded that the contracts did not cover AT&T facilities to be used by WU to provide foreign exchange (FX) and common control switching arrangement (CCSA) services,[1] and that in accepting its satellite authorization WU had waived any contract rights it might have had in connection with facilities for its domestic satellite service. WU, therefore, would be obliged to lease facilities for these services at the higher rates set forth in AT&T tariffs filed with the Commission, not at the lower contract rates. We hold that the Commission acted within its statutory authority and that its conclusions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[2] Accordingly, we deny WU's petition for review.
 
 I.
 
 2
 A detailed history of the disputes underlying this litigation is set forth in Bell Telephone Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975), and will not be repeated here. That decision constitutes the legal predicate for the litigation at bar. There we affirmed a decision and order of the FCC which in pertinent part (a) required AT&T to furnish to all specialized common carriers among them WU interconnection facilities to provide authorized communications services including FX and CCSA services, and (b) rejected AT&T tariffs insofar as they covered interconnection facilities and services already covered by Bell-Western Union exchange of facilities contracts. Bell Telephone Co. v. FCC established that the Communications Act does not authorize the modification or abrogation of contracts by subsequently filed tariffs. But the order of the Commission there affirmed also said that, with respect to facilities not covered by exchange of facilities contracts, AT&T was to charge pursuant to tariffs. 503 F.2d at 1282-84.
 
 
 3
 Following the decision in Bell Telephone Co. v. FCC, AT&T refused WU's requests to lease facilities for FX, CCSA, and domestic satellite services at contract rates although AT&T leased identical facilities at those rates when the facilities were used for other services. WU sought relief in administrative proceedings before the Commission. On October 16, 1974, the Commission decided that WU had waived any contract rights it might have had in connection with facilities for its domestic satellite service when it accepted its satellite authorization, but emphasized that AT&T was required to interconnect with WU to permit WU to provide FX and CCSA services. The Commission did not, at that time, decide whether the required FX and CCSA interconnections were to be pursuant to tariff or contract, but asked the parties to brief the question. 49 F.C.C.2d 321 (1974). On June 24, 1975, the Commission released its Memorandum Opinion and Order rejecting WU's contention that the exchange of facilities contracts covered FX and CCSA services and denying reconsideration of its prior decision that domestic satellite contract rights, if any, had been waived. 53 F.C.C.2d 1045 (1975).
 
 
 4
 In concluding that FX and CCSA services were not covered by the exchange of facilities contracts, the Commission relied upon the language of the contracts. Conceding that facilities available under the contract are technically capable of furnishing FX and CCSA services, the Commission asked instead "whether the contracts allow the use of these facilities for FX and CCSA services." 53 F.C.C.2d at 1050. This question it resolved by reference to contract sections 3(b)[3] and 3(d),[4] finding the controlling language in section 3(d): "Connection of Western Union private line services with Telephone Company services shall be allowed only under the tariffs of the Telephone Company . . . " The contracts distinguish between services and facilities.[5] Section 3(d) applies expressly to services. In the Commission's view, however, section 3(d) served a definitional purpose, referencing the contracts themselves to services allowed at the date of contracting and, thereby, limiting contract facilities to use for such services:
 
 
 5
 The purpose of this provision is to define those situations in which Western Union services utilizing facilities obtained under the contracts, may be connected to Bell services. Since this provision references the applicable telephone company tariffs, the question before us is whether the cross reference to the applicable tariffs is to be made as of the time of contracting (e. g., January 1, 1970) or as of the date the interconnection of services is to be made. The law is well settled that all parts or sections of a contract must be given effect, force and meaning, if possible, and if it can fairly and reasonably be done; and that a construction rendering a provision or term meaningless or superfluous should be avoided. If there were no Section 3(d) in the contract, then the terms and conditions governing the connection of Bell services with the services of other common carriers would be found in the then effective applicable Bell System customer tariffs. If the cross reference to the applicable telephone company tariffs is meant to be to the then effective tariff provisions, then Section 3(d) would be superfluous. Therefore, in order to give meaning to Section 3(d), we conclude that the cross reference to applicable telephone company tariffs is to be made as of the time of contracting (e. g., January 1, 1970). Since the telephone company tariffs, at that time, did not allow Western Union to interconnect its private line services with Bell's services for the purpose of providing its own FX and CCSA services, we conclude that Western Union may not obtain under the contracts, facilities which would be used in the provision of FX and CCSA services. Western Union may, of course, obtain such facilities pursuant to Bell tariffs on file with this Commission, in the same manner and at the same rates as other common carriers offering FX and CCSA type services.
 
 
 6
 53 F.C.C.2d at 1051 (footnotes omitted).
 
 
 7
 The FCC authorized WU's domestic satellite application on January 18, 1973, subject to the condition that WU's "facilities shall be operated in accordance with all Commission policies adopted in Docket No. 16495 (which established basic domestic satellite policy objectives) and all rules and policies subsequently made applicable to domestic satellite communications. . . ." 38 F.C.C.2d 1197, 1199 (1973). Some eight months later, in the context of AT& T's domestic satellite application, the Commission decided that tariffs, not private contracts, were the means most conducive to achieving its basic policy objectives of reasonable and non-discriminatory satellite licensee access to AT&T facilities.[6] The effect of the quoted conditional language, the Commission here concluded, was to waive any contract rights WU might have had in connection with its satellite operations, and to subject those operations to the subsequently articulated tariff policy. "We conclude that Western Union willingly and knowingly accepted a condition in its domestic satellite authorization, as implemented by the unchallenged AT&T decision, which constituted a voluntary waiver of its contract rights if any existed." 53 F.C.C.2d at 1054.
 
 
 8
 WU petitions for review under § 402(a) of the Communications Act, as amended, 47 U.S.C. § 402(a), and 28 U.S.C. § 2342(1).
 
 
 9
 We turn now to review of the Commission's conclusions: first, concerning FX and CCSA services, and, second, concerning domestic satellite service.
 
 II.
 
 10
 Preliminarily, we must address a question raised concerning the proper scope of our review of the FCC's conclusions concerning FX and CCSA services. Both parties, correctly, agree that the pertinent statute is § 706 of the Administrative Procedure Act, note 2 supra, which provides that a reviewing court shall set aside agency conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. WU argues, however, that the Commission here was not applying the Communications Act which is the agency's expert province, but was applying general common law precepts of contract construction in which the agency has no particular expertise. Accordingly, the argument continues, the Commission here is entitled to no greater deference from this court than would be due a district court in a breach of contract action. We cannot agree.
 
 
 11
 WU makes no attempt to harmonize its argument for a more stringent standard of review with the apparently clear language of the Administrative Procedure Act. We find no ambiguity in the statutory standard. Nor do we perceive any intimation that an agency's resort to general legal precepts in determining a matter within the ambit of its expertise suffices to divest that determination of judicial deference otherwise due. Certainly, this controversy falls within the ambit of the FCC's expertise. These agreements involve complex, sophisticated, and rapidly-evolving communications technology. Quite properly, WU took the matter to the FCC for resolution, not to a district court.[7] Moreover, the agreements implicate questions of national regulatory policy. They concern the applicability of Commission-approved tariffs intended to provide access to all common carriers on reasonable and non-discriminatory terms. Under these circumstances, the fact that these are private agreements cannot alter the statutory deference due the Commission. See North Atlantic Westbound Freight Ass'n v. FMC, 130 U.S.App.D.C. 122, 397 F.2d 683, 685 (1968); Manufacturers Light & Heat Co. v. FPC, 374 F.2d 88, 89 (3d Cir. 1967). We will upset the Commission's conclusion concerning FX and CCSA only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Meadville Master Antenna, Inc. v. FCC, 535 F.2d 214 (3d Cir. 1976).
 
 
 12
 WU objects to the FCC's conclusion concerning FX and CCSA in three respects. First, WU focuses on the Commission's determination that the contracts cover the technical facilities that would provide FX and CCSA services. This determination, WU contends, should have been dispositive of the litigation. WU here contends, in effect, for a plenary obligation on the part of AT&T to provide contract facilities for any services that WU might be authorized to, and choose to, provide during the term of the contracts. But the Commission aptly answered this contention: "the question to be resolved is not whether the facilities available under the contracts are capable of furnishing FX and CCSA services, but rather whether the contracts allow the use of these facilities for FX and CCSA services." 53 F.C.C.2d at 1050.
 
 
 13
 Second, WU takes issue with the Commission's reliance on section 3(d) as defining the services for which contract facilities are available by reference to services being provided by WU at the time of contracting in 1970. WU argues that the purpose of section 3(d) is not to define services for which contract facilities are available, but is "to acknowledge that such service connection configurations are consistent with these facilities contracts." (Petitioner's Brief at 22.) According to WU, section 3(d) contemplates an arrangement where WU would lease facilities at contract rates and services at tariff rates.[8] AT&T's response is multi-faceted. Distilled to its essence, however, it is that WU's interpretation results in an "open-ended" obligation to provide facilities at contract rates, and that other contract provisions evidence no intention on the part of AT&T to assume such an obligation. Most particularly, AT&T points to section 3(b), note 3 supra, with its enumeration of five specific instances in which circuits leased to WU under contract may be connected with other circuits, and its requirement of AT&T approval for other connections. AT&T also points to section 2(d)[9] of Contract No. 2, and section 2(g)[10] of Contract No. 1 (identically reproduced in section 2(f) of Contract No. 2), as evidence that the parties did not contemplate the obligation that WU seeks to impose. AT&T, of course, vigorously supports the FCC's reference to 1970 as the time for judging the scope of the parties' obligations, asserting that "it is clear that section 3, read as a whole, plainly mandates" such a reference. (Intervenors' Brief at 31.)
 
 
 14
 Unfortunately, what is clear and plain to the advocates is not always clear and plain to the court. This aspect of the argument is slippery. But we need not decide what result we would reach if faced with the necessity of construing de novo these Delphic contractual provisions. What is clear only is that it is not clear what these provisions, especially section 3(d), mean. Certainly, it was not arbitrary or capricious to conclude, as the Commission did, that the contracts embodied some limitation on AT&T's obligation to provide facilities technically covered by the specifications of the contracts. Neither, we believe, was it arbitrary or capricious for the Commission to interpret section 3(d) as imposing that limitation by referencing the contracts to the time of contracting. Accordingly, we reject WU's argument concerning the interpretation of section 3(d).
 
 
 15
 Finally, WU contends that the Commission's decision was tainted by the application of erroneous standards of law, to-wit, by consideration of parol evidence as to the contracting parties' intentions, and by adoption of a policy of strict construction of the exchange of facilities contracts. WU's parol evidence contention is based on the Commission's consideration of an affidavit concerning AT&T's intentions during the negotiations and in the execution of the contracts.[11] For this contention to have logical validity, WU would have to establish at a minimum: (a) as a matter of administrative law, that the Commission was bound to apply the parol evidence rule, and (b) as a matter of contract law,[12] that the rule was applicable. WU has not established either of these propositions. We have strong doubts on both scores, but we have no occasion to go further than the basic precept of administrative law set forth in § 556(d) of the Administrative Procedure Act: "Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d).[13] The paramount issue being the real intention of the parties, Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123, 1131 (3d Cir. 1969), and the Commission having obviously concluded that an affidavit speaking to that issue was not "irrelevant, immaterial, or unduly repetitious", we are not in a position to gainsay that conclusion.[14] The Commission considered a similar affidavit supplied by WU, note 11 supra, so clearly the practice here was even-handed. And, in any event, the agency's opinion makes clear that the affidavits were not dispositive in effect; they merely "buttressed" its conclusions concerning FX and CCSA. Ibid. We reject the parol evidence argument.
 
 
 16
 WU gets no further with its attack on the FCC's announced policy of strict construction of the exchange of facilities contracts.[15] WU interprets this as a policy to construe the contracts "not in accord with their literal meaning, but as narrowly as possible" and asserts that such a policy "necessarily would stem from authority granted the agency in the Communications Act to abrogate, set aside or modify the contracts, and it is settled that no such authority exists, except possibly under formal hearing procedures, not followed here." (Petitioner's Brief at 31-32.) This argument misconceives the agency's action: the Commission here did not abrogate, set aside or modify the contracts, it construed them. Of course, opinions may differ as to the proper limits and results of construction. But where, as here, the meaning of contractual provisions is contested and unclear, we have no hesitancy in characterizing the process as construction. Moreover, while we would see no impropriety in alertness to policy implications of contract construction, we find no evidence in the decision under review of the application of any particular philosophy of construction, strict or otherwise. We find simply an effort to determine the intentions of the parties embodied in a group of difficult contractual provisions. Again, we can discern no basis to disturb the FCC's conclusions.
 
 
 17
 We have considered WU's arguments, and we have reviewed the FCC's conclusion that FX and CCSA services are not covered by the exchange of facilities contracts. We do not find that conclusion to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
 
 III.
 
 18
 Turning to the domestic satellite aspect of the petition for review, we again address the threshold question of the proper scope of our review. In this phase of the case, WU makes two substantive arguments: first, that the WU satellite authorization was not, in fact, conditioned on a waiver of contract rights; and second, that any such condition imposed constituted an unlawful expansion of the Commission's regulatory powers. With regard to WU's first argument, our review must be based on determining whether the FCC's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The reasons set forth previously for applying that standard apply here a fortiori. Primarily, this argument turns on an interpretation of the FCC's own prior action in imposing the contested waiver, and upon a factual determination whether WU knowingly and voluntarily accepted its authorization subject to the condition. We will accord the full deference of the statutory standard to the Commission's conclusions on these points. With regard to WU's second argument, our review is of a different character. A claim that agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority. See, e. g., FPC v. Moss, 424 U.S. 494, 96 S.Ct. 1003, 47 L.Ed.2d 186 (1976).
 
 
 19
 In marked contrast to the parties' contractual language previously discussed, the Commission's language in its January, 1973, satellite authorization to WU was quite explicit: "these (satellite) facilities shall be operated in accordance with all Commission policies adopted in Docket No. 16495 and all rules and policies subsequently made applicable to domestic satellite communications." 38 F.C.C.2d at 1199. Having argued that the FX and CCSA contract terms were clear and unambiguous, WU here contends that the Commission's language was not sufficiently clear to give fair notice of a waiver. WU asserts that in January, 1973, it had no reason to suspect that it was waiving contract rights. "No policy was then in effect or subsequently adopted in the orders cited by the FCC compelling Western Union to waive its contract rights in order to receive the requested domestic satellite authority." (Petitioner's Brief at 37.) But the FCC had said in June, 1972, that its objective was "that all carriers providing retail interstate satellite services . . . have access at non-discriminatory terms and conditions to local loop and interchange facilities." 35 F.C.C.2d at 856 (1972). WU is not unsophisticated; at the least this language adumbrated the possibility that tariffs might be applied. And surely a policy was "subsequently adopted" in connection with AT&T's satellite application, 42 F.C.C.2d at 656-60 which required that tariffs, not private contracts, govern domestic satellite facilities. The Commission said:
 
 
 20
 . . . In summary, as a participant in Docket No. 16495, Western Union was on actual notice of: (a) the Commission's general policy objective on access and interconnection; (b) the regulatory approach adopted by the Commission to develop appropriate means to realize such policy objective and; (c) that as a potential domestic satellite licensee it would be subject to any interconnection and access policies adopted by the Commission pursuant to the Second Report.
 
 
 21
 . . . (W)e find it difficult to believe that as an established common carrier Western Union would not anticipate, either at the time of our Second Report and Reconsideration Orders or at the time its authorization was granted, that we might reach the determination after appropriate consideration of AT& T's applications and interconnection proposal that tariffs, rather than private contracts, would be the most appropriate means to assure the realization of our access and interconnection policy objectives which stressed the goal of "reasonable and non-discriminatory" interconnection. In light of the foregoing and Section 203 of the Communications Act, we deem Western Union's claim of lack of notice to be untenable. In any event, Western Union failed to challenge the AT&T grant, and is therefore now bound by that final decision. We conclude that Western Union willingly and knowingly accepted a condition in its domestic satellite authorization, as implemented by the unchallenged AT&T decision, which constituted a voluntary waiver of its contract rights, if any existed.
 
 
 22
 53 F.C.C.2d at 1053-54 (1975).
 
 
 23
 We do not believe that this conclusion was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
 
 
 24
 WU's final argument that the imposition of a waiver exceeded the Commission's statutory authority is not persuasive. The Commission is expressly authorized by statute to "attach to the issuance of (a) certificate such terms and conditions as in its judgment the public convenience and necessity may require." 47 U.S.C. § 214(c). Recognizing the existence of § 214(c), WU is forced to argue that it cannot be considered as authorizing the Commission to impose a waiver of contract rights as a condition. The gravamen of the argument is that such an interpretation would allow the Commission to do "indirectly" by condition what it is forbidden to do "directly" by tariff, viz., modify or abrogate contracts. Bell Telephone Co. v. FCC, supra. The argument fails because of the brute fact that there is a significant difference between a voluntary waiver of rights in order to secure a benefit not otherwise obtainable,[16] and the extinguishment of rights by tariffs which provide no quid pro quo. Keeping in mind also that § 214 applies only to new lines or extensions, we see no inconsistency between the condition imposed in this case and the rule of Bell Telephone Co. v. FCC that the Act does not authorize the abrogation or modification of contracts by subsequently filed tariffs. The Commission specifically stated that "(t)he condition we imposed on Western Union's authorization is reasonable and in our judgment serves the public convenience and necessity in assuring flexible regulation of domestic satellite communications and the provision of services and facilities on a reasonable and non-discriminatory basis." 53 F.C.C.2d at 1055 (1975). Far from overstepping its statutory bounds, the Commission appears to have acted carefully and consciously within the express language of § 214(c). We decline to hold the Commission's action unlawful.
 
 
 25
 We have considered all the contentions raised by the petition for review. The petition will be denied.
 
 
 26
 Chief Judge Seitz joins in Judge Aldisert's opinion. However, even assuming that the dissenting opinion has stated the applicable scope of review, he would still deny the petition for review.
 
 GARTH, Circuit Judge (dissenting):
 
 27
 The majority's resolution of this petition for review has, in my view, dangerously limited the scope of judicial scrutiny of administrative decisions. The administrative agency's interpretation of the contracts at issue here was based solely upon principles of contract construction and not agency expertise. In according deference to the Federal Communications Commission's interpretation of these contracts, I believe the majority has given the agency virtually unreviewable power in matters of law, a power denied to federal district courts, although courts are presumably expert in such matters. Reason compels no such abdication of our appellate function, nor does it require substitution of our normal de novo standard of review for the standard employed by the majority.
 
 I.
 
 28
 As stated by the majority (Majority Op. at 348-351), the matters in issue here follow directly from the Federal Communications Commission's (FCC) order dated April 23, 1974 which this Court affirmed in Bell Telephone Co. of Pennsylvania v. F.C.C., 503 F.2d 1250 (3d Cir. 1974), cert. denied, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). That order required the American Telephone and Telegraph Company (AT&T) and the Bell System Operating Companies (Bell) to furnish specialized common carriers,[1] including Western Union, with interconnection facilities pursuant to tariffs for foreign exchange (FX) and common control switching arrangement (CCSA)[2] services. However, the April 23, 1974 order provided that the Bell Companies could not abrogate Western Union's existing contractual rights through the adoption of tariffs. Therefore, interconnection facilities would be available to Western Union for FX and CCSA services at contract rate if these facilities were covered by the Bell-Western Union exchange of facilities contracts, and would otherwise be available at tariff rate.
 
 
 29
 Thereafter, Western Union requested that the Bell Companies furnish interconnection facilities for FX, CCSA, and domestic satellite communication services at the lower contract rates. The Bell Companies refused, claiming that these facilities were only available under tariffs. As a result Western Union filed complaints with the FCC against AT&T and the Bell Companies. It is these complaints that give rise to this petition for review.
 
 
 30
 I am in complete accord with the majority's statement that our review of the FCC orders at issue here is governed by section 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). That section states in pertinent part:
 
 
 31
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action. The reviewing court shall
 
 
 32
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 33
 (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law, . . .
 
 
 34
 However, I believe § 706(2)(A) does not create a single standard of review applicable to all situations. The phrase "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" is worded in the disjunctive, thereby providing alternative tests for scrutinizing agency action. While the standard of arbitrary, capricious, and abuse of discretion is appropriate in some instances, Congress has required the reviewing court to "decide all relevant questions of law" and thereafter to set aside agency determinations "not in accordance with law." The APA thus recognizes a basic postulate of our system of appellate jurisprudence that while deference must be accorded to judgments of lower tribunals based upon factors within their special knowledge or experience, an appellate court is entrusted with plenary, de novo review of all questions of law. Consequently, I believe a determination of the appropriate APA standard of review can only be made after examining the type of agency action presented in this petition.
 
 
 35
 The FCC characterized the FX-CCSA issue as purely a question of contract construction whether "the Bell-Western Union exchange of facilities contracts cover the leasing of interconnection facilities to be used in furnishing FX-CCSA services." 53 F.C.C.2d 1045 (1975). Moreover, in resolving this legal problem the FCC relied solely upon principles of contract law. Paragraph 16 of the Memorandum Opinion and Order of June 24, 1975 states:
 
 
 36
 16. Foreign exchange (FX) service involves the connection of a pure private line service to a local exchange service, and CCSA service is a switched private line service involving the connection of various private line services through AT&T's Common Control Switching Arrangements (CCSA). For Western Union to provide FX and CCSA service it is necessary in either case to connect Western Union's private line services with Bell services. Thus the controlling provision in the contracts is Section 3(d) which states, in pertinent part, that "Connection of Western Union private line services with Telephone Company services shall be allowed only under the tariffs of the Telephone Company . . . ." The purpose of this provision is to define those situations in which Western Union services utilizing facilities obtained under the contracts, may be connected to Bell services. Since this provision references the applicable telephone company tariffs, the question before us is whether the cross reference to the applicable tariffs is to be made as of the time of contracting (e. g., January 1, 1970) or as of the date the interconnection of services is to be made. The law is well settled that all parts or sections of a contract must be given effect, force and meaning, if possible, and if it can fairly and reasonably be done; and that a construction rendering a provision or term meaningless or superfluous should be avoided. 11 If there were no Section 3(d) in the contract, then the terms and conditions governing the connection of Bell services with the services of other common carriers would be found in the then effective applicable Bell System customer tariffs. If the cross reference to the applicable telephone company tariffs is meant to be to the then effective tariff provisions, then Section 3(d) would be superfluous. Therefore, in order to give meaning to Section 3(d), we conclude that the cross reference to applicable telephone company tariffs is to be made as of the time of contracting (e. g., January 1, 1970). Since the telephone company tariffs, at that time, did not allow Western Union to interconnect its private line services with Bell's services for the purpose of providing its own FX and CCSA services, we conclude that Western Union may not obtain under the contracts, facilities which would be used in the provision of FX and CCSA services. Western Union may, of course, obtain such facilities pursuant to Bell tariffs on file with this Commission, in the same manner and at the same rates as other common carriers offering FX and CCSA type services. 12 (Footnote 12 omitted) (Emphasis added.)
 
 
 37
 53 F.C.C.2d at 1051.
 
 
 38
 The second issue concerning the availability of interconnection facilities under the contracts for domestic satellite services also presented a purely legal question whether Western Union in accepting domestic satellite authorization waived any rights under the contracts. Paragraphs 9 and 10 of the Memorandum Opinion and Order of October 16, 1974 capsulize the FCC's analysis:
 
 
 39
 9. Western Union also sought authorization from the Commission to provide its own domestic satellite communications. These applications were also granted subject to the condition that the facilities would be operated in accordance with Commission policies adopted in the Second Report and Order, 35 FCC2d 844 (1972), and "all rules and policies subsequently made applicable to domestic satellite communications. . . ." Western Union Telegraph Co., 38 FCC2d 1197, 1199 (1973). Western Union willingly accepted such a conditional grant.
 
 
 40
 10. Both Bell and Western Union willingly and knowingly accepted their domestic satellite authorizations subject to the explicit condition that tariffs, not private contracts, would be filed setting forth the charges, classifications, regulations and practices applicable to such facilities. AT& T, 42 FCC2d 654, 659 (1973). Bell System Tariff Offerings, 46 FCC2d 413, 437. We held that such tariffs were "the most appropriate means by which to achieve our objective that these facilities (should) be provided to other satellite carriers on 'reasonable and non-discriminatory conditions.' " AT&T, 42 FCC2d 654, 659 (1973). 4 Bell and Western Union thus agreed to waive any rights, if any existed, to obtain such facilities by any means other than a tariff. Neither can now allege a right to such facilities under any contracts. "When an applicant accepts a government permit which is subject to certain conditions, he cannot later assert alleged rights which the permit required him to surrender in order to receive it." Capital Telephone Company v. Federal Communications Commission, 162 U.S.App.D.C. 192, 498 F.2d 734, slip op. 11, No. 72-1715, D.C.Cir., 1974. (498 F.2d 734, 740). (Emphasis added.)
 
 
 41
 49 F.C.C.2d 321, 323 (1974). On reconsideration of this opinion and order the FCC further expanded upon its waiver theory still relying upon the precise terms of the satellite grant (see p. 361, infra ). 53 F.C.C.2d at 1052-55.
 
 
 42
 The majority regards this issue of waiver as a factual determination (Majority Op. at 354) which is again subject to the "arbitrary, capricious, and abuse of discretion" standard. I cannot agree. The Commission itself has predicated Western Union's "waiver" solely upon the precise terms of its grant of domestic satellite authorization. Thus, in holding that Western Union "waived" its contract rights, the FCC relied upon no factual determination and did not go outside the exact terms of the grant. Nor did the question of Western Union's knowing and willing relinquishment of any rights under its contracts involve the FCC's interpretation of its own prior actions. For "waiver" looks to the knowledge and conduct of Western Union at the time of accepting the grant and not to the FCC's subsequent interpretation of its own intent in authorizing the grant. Thus, while I acknowledge that deference is accorded to an agency's interpretation of its own actions or agreements where the issue may involve the meaning of that particular action or agreement, I see no basis for "deference" when the issue for determination necessarily arises from the knowledge, conduct, and intent of third parties such as Western Union here.
 
 
 43
 Since the waiver here involves neither factual conclusions, nor interpretation requiring agency expertise, I find no basis for applying an "arbitrary or capricious" standard which is traditionally applied in such circumstances. Rather, here ". . . where the only evidence as to waiver is a writing, its construction and interpretation and whether or not it constitutes a waiver is a question of law for the court." Hanover Construction Co. v. Fehr, 392 Pa. 199, 139 A.2d 656, 658 (1958); Griffin v. United States of America, 500 F.2d 1059, 1072 (3d Cir. 1974); Crabb v. Commissioner of Internal Revenue, 121 F.2d 1015 (5th Cir. 1941). Hence the appropriate APA standard to be applied here is the standard of "not in accordance with law," a standard which requires a plenary, de novo review of the documents in question.
 
 
 44
 Applying strictly legal principles, the FCC concluded that the Bell-Western Union contracts did not extend to facilities for FX and CCSA services and that Western Union waived any contract rights with respect to domestic satellite services. In reviewing decisions that are grounded upon principles of contract law, their "validity must likewise be judged on that basis. The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." S.E.C. v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); Texas Gas Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960). Hence, I conceive of our function as being one of reviewing the FCC's application of strictly legal precepts to the Bell-Western Union controversy.
 
 
 45
 However, the majority evidently does not share in this view. Instead the majority has characterized the matter before us as
 
 
 46
 . . . an agency's resort to general legal precepts in determining a matter within the ambit of its expertise . . .. Certainly this controversy falls with the ambit of the FCC's expertise. These agreements involve complex, sophisticated, and rapidly-evolving communications technology. . . . Moreover, the agreements implicate questions of national regulatory policy. . . .
 
 
 47
 Majority Op. at 355. Although the FCC does exercise special competence with respect to the many decisions entrusted to it under the Federal Communications Act, 47 U.S.C. § 151 et seq., I know of no reason to conclude that this competence extends to the subject of contract construction an area that has traditionally been considered within the special province of a court's expertise. Moreover, even if the FCC had special ability in such matters, its decisions here were predicated solely on the basis of contract law and not upon any expertise or policy considerations. Thus, the possibility that this controversy falls within the special competence of the FCC is irrelevant to our consideration since "(t)he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." S.E.C. v. Chenery Corp., supra at 87, 63 S.Ct. at 459. Hence, I believe our review is strictly limited to the FCC's application of contract principles to the issues presented.
 
 
 48
 Our initial inquiry as to the appropriate APA standard for review of the FCC orders presented here may be further refined as follows: Which of the § 706(2) (A) standards "arbitrary, capricious, an abuse of discretion" or "not in accordance with law" must we apply in reviewing agency decisions that are based exclusively upon principles of contract law? This is by no means a question of first impression. In a similar context, this Court, without even discussing its scope of review, considered de novo the Federal Power Commission's interpretation of a clause in a contract for the sale of natural gas. Shell Oil Co. v. F.P.C., 263 F.2d 223 (3d Cir. 1959). Our plenary review of the contract in Shell Oil Co. resulted in a petition for certiorari which the Supreme Court granted, having been "particularly moved to do so by the contention . . . that the Court of Appeals exceeded the appropriate scope of judicial review of the Commission's determination." Texas Gas Corp. v. Shell Oil Co., 363 U.S. 263, 268, 80 S.Ct. 1122, 1126, 4 L.Ed.2d 1208 (1960).
 
 
 49
 The Supreme Court analyzed the challenge to this Court's review of the F.P.C. contract interpretation as follows:
 
 
 50
 We may assume with the petitioners that the Court of Appeals did not treat the Commission's order as one which it was required to accept if reasonably supported in the record, and instead considered that it could examine de novo the question of the proper interpretation to be given the Shell "favored nation" clause. The petitioners' argument that the Court of Appeals exceeded the allowable limits of judicial review is based upon the premise that the Commission's interpretation of the "favored nation" clause reflects the application of its expert knowledge and judgment to a highly technical field, so that the Court of Appeals was required to accept the Commission's interpretation if it had " 'warrant in the record' and a 'reasonable basis in law,' " citing Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153-154 (67 S.Ct. 245, 250, 91 L.Ed. 136). But the record nowhere discloses that the Commission arrived at its interpretation of the "favored nation" clause on the basis of specialized knowledge gained from experience in the regulation of the natural gas business, or upon the basis of any trade practice concerning "favored nation" clauses. On the contrary the opinions of the examiner and the Commission show that both treated the question as one to be determined simply by the application of ordinary rules of contract construction.
 
 
 51
 363 U.S. at 268-69, 80 S.Ct. at 1126. I can find no difference between the standard of review actually applied by the majority here and the position urged by the petitioners upon the Supreme Court in Texas Gas Corp., supra. Therefore, the Supreme Court's total rejection of the petitioner's argument in Texas Gas Corp. and its affirmance of this Court's standard of de novo review,[3] makes, in my view, the majority's position here untenable.
 
 
 52
 Confronted with precisely the same question as we are here as to the appropriate standard for review of an agency's contract interpretation, the Supreme Court stated:
 
 
 53
 "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Securities & Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 87 (63 S.Ct. 454, 459, 87 L.Ed. 626). Therefore, since the Commission professed to dispose of the case solely upon its view of the result called for by the application of canons of contract construction employed by the courts, and did not in any wise rely on matters within its special competence, the Court of Appeals was fully justified in making its own independent determination of the correct application of the governing principles. See Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 91 (73 S.Ct. 998, 97 L.Ed. 1470). There applies here what the Court said in Chenery : "Since the decision of the Commission was explicitly based upon the applicability of principles (of contract interpretation) announced by courts, its validity must likewise be judged on that basis." 318 U.S., at page 87 (63 S.Ct. (454) at page 459).
 
 
 54
 363 U.S. at 270, 80 S.Ct. at 1126-1127. Thus, where an administrative agency's construction of a contract was based solely upon legal principles, the Supreme Court held that this Court "was fully justified in making its own independent determination of the correct application of the governing principles." Id. at 270, 80 S.Ct. at 1127. Furthermore, I suggest that de novo consideration of an agency's resolution of legal issues is not only "justified" but mandated by the APA. For § 706 requires that "the reviewing court . . . decide all relevant questions of law. . . ." Thus, this Court's position with respect to the proper standard of review in Shell Oil Company v. F.P.C. as approved by the Supreme Court in Texas Gas Corp. and the very terms of the APA are, in my view, dispositive of the issue presented here.
 
 
 55
 Reason, in addition to controlling authority, argues against any other conclusion here. The scope of appellate review of agency actions reflects to varying degrees the limited competence of an appellate tribunal to pass upon matters that involve specialized knowledge and important policy considerations. In such matters deference must be shown to the administrative agency specially created by Congress to make decisions based upon expertise. However, when, as here, an agency relies upon strictly legal principles to resolve a controversy, an appellate court is at least equally capable, and probably more capable, of applying the legal precepts involved. Moreover, when a district court in an identical situation resolves questions of contract law, this Court engages in de novo consideration of the issues. Thus, I perceive no basis which requires this Court to give special consideration to the application of legal principles by an administrative agency. Indeed, I believe the very opposite is called for.
 
 
 56
 Nor am I in the least persuaded by the two cases cited by the majority in support of its view that deference should be accorded to the FCC's interpretation of the contract questions at issue here. In Manufacturers Light and Heat Co. v. F.P.C., 374 F.2d 88 (3d Cir. 1967) (per curiam ), this Court granted "substantial weight to the expert judgment of the Commission" in the interpretation of a settlement agreement which had been confirmed by the F.P.C. in a rate proceeding as to which the F.P.C. was itself a party. The issue of how refunds under the agreement should be properly allocated implicated the special knowledge of the F.P.C., and therefore this Court properly concluded that the F.P.C.'s judgment should "not be lightly regarded." Id. at 89.
 
 
 57
 Furthermore, the majority's reliance upon North Atlantic Westbound Freight Assoc. v. Federal Maritime Comm'n, 130 U.S.App.D.C. 122, 397 F.2d 683 (1968) (per curiam ), is also inapposite. There, with respect to judicial review of conference agreements in the maritime freight industry, the Court of Appeals stated:
 
 
 58
 Certainly where underlying issues of fact or policy are involved an agency's interpretation of agreements is due judicial respect and deference. . . . Specifically in regard to conference agreements, the Commission is to be given "reasonable leeway in delineating the scope" of these agreements. . . .
 
 
 59
 397 F.2d at 685. However, here, there is no suggestion that the FCC's interpretation of the Bell-Western Union contracts was based upon underlying issues of fact or policy. Nor are these Bell-Western Union contracts analogous to the industry-wide conference agreements at issue in North Atlantic Westbound Freight Assoc. Thus, I can only conclude that the majority's reliance upon these cases is completely misplaced.
 
 
 60
 Summarizing my view, since the FCC orders before us were decided strictly upon legal principles, I believe our task under the APA is to determine whether these agency actions are "in accordance with law." 5 U.S.C. § 706(2)(A). In resolving such legal questions, our scope of review is both plenary and de novo. Since the APA does not suggest but requires that we "decide all relevant questions of law," I can find no authority for the majority's assertion that agency determinations of legal questions must be accorded special consideration or deference. Therefore, I believe this Court is required to engage in an independent review of the FCC's decisions concerning the availability of interconnection facilities for Western Union's FX, CCSA, and domestic satellite services.
 
 II.
 
 61
 Based upon a de novo review of the legal issues presented, see Part I, supra, I believe the FCC's interpretation of the Bell-Western Union contracts is unwarranted and tortured. As explained by the majority, see Majority Op. at 349-350, the thrust of the FCC's decision is found in Paragraph 16 of the Memorandum Opinion and Order of June 24, 1975, 53 F.C.C.2d 1045 (1975). See p. 357 supra. There the FCC concluded that Section 3(d) "define(d) those situations in which Western Union services utilizing facilities obtained under the contracts, may be connected to Bell services." In "order to give meaning to Section 3(d)," the FCC construed this provision as allowing for the connection of Western Union services utilizing contract facilities to only those Bell services for which tariffs existed as of the time of contracting, January 1, 1970. Therefore, under the Commission's analysis, the facilities necessary for Western Union's FX and CCSA services were not available under the contracts since Bell tariffs in existence on January 1, 1970 did not allow for the connection of Western Union services with Bell FX and CCSA services.
 
 
 62
 I begin my analysis of these contracts with section 2, which describes the general undertaking of the parties. Under section 2 each party agreed to "lease to the other . . . circuits and certain related facilities, to be operated by the lessee as part of or in connection with its plant . . . in furnishing communication service to the public." (Emphasis added.) App. 86-87; 110-111. FX and CCSA, two particular types of private line services, clearly constitute a type of "communication service to the public."
 
 
 63
 The only explicit limitation placed upon the uses for which facilities subject to the contracts could be put is found in section 3. Under section 3(a),
 
 
 64
 . . . circuits leased to the Telegraph Company (Western Union) hereunder may be used only in providing its common carrier communications services for which such circuits are suitable. (Emphasis added.)
 
 
 65
 App. 87, 112. Here, Western Union sought to lease contract facilities to furnish FX and CCSA services, both of which are "common carrier communications services." Furthermore, the FCC implicitly recognized the "suitability" of these facilities for Western Union's private line services when it concluded:
 
 
 66
 . . . from a purely technical or operational viewpoint, it appears that the circuits and related facilities specified in the contracts provide the capability for Western Union to access Bell's exchange and CCSA switching equipment, thus making it physically possible for Western Union to use contract facilities for its own FX and CCSA services.
 
 
 67
 53 F.C.C.2d at 1050.
 
 
 68
 Sections 2 and 3 of the contracts thus indicate the parties' intentions to permit the leasing of all facilities so long as they were used for common carrier communications services and the facilities were suitable for this purpose. The parties, sophisticated corporations in the communications industry, placed no limitation on the particular type of communications services for which the facilities could be used. Nor do I believe that section 3(d), which the Commission relied on, imposes any such limitations.
 
 
 69
 Section 3(d) simply provides for the connection of Western Union services with Bell services:
 
 
 70
 Connection of Western Union private line services with Telephone Company services shall be allowed only under the tariffs of the Telephone Company and consistent with the terms and conditions of such tariffs applicable to the connection of Western Union provided services with services of the Telephone Company. No such connection shall at any time be made in any jurisdiction except as duly authorized by tariffs in force and effect.
 
 
 71
 App. 89. Whereas the other portions of the contracts provide that facilities will be available at contract rate, this section provides that tariff, rather than contract rate, shall govern the interconnection of services. There is no indication that this section was intended to freeze the types of services for which facilities under the contracts could be used. Moreover, the last sentence of the section, ignored by both the FCC and the majority here, further supports my interpretation. That sentence states: "No such connection shall at any time be made in any jurisdiction except as duly authorized by tariffs in force and effect." This specification that connection was only to be made at "tariffs in force and effect" constitutes an implicit recognition that the services subject to tariff as well as the amount of the tariff were subject to change. Thus, it would seem that only the tariffs "in force and effect" at any particular time are relevant to the question of whether Western Union and Bell services may be connected under section 3(d).
 
 
 72
 Nor does such a construction render section 3(d) superfluous as the FCC suggests. The provision represents agreement by the parties that the services offered by each may be connected, and it establishes the rate which governs such connection. Such a provision is both meaningful and significant. Whether, in the absence of such a provision, the services could be connected at the prevailing tariffs is irrelevant to parties' desire to reduce this matter to writing and thereby avoid a possible area of dispute.
 
 
 73
 In concluding that the FCC erred in its interpretation of the Bell-Western Union contracts, I see no need to reach or decide Western Union's arguments concerning the parol evidence rule or the Commission's strict construction of the contracts. Hence, I would conclude based upon a de novo review that the facilities necessary for Western Union's FX and CCSA services are available under the Bell-Western Union contracts.
 
 III.
 
 74
 Exercising an independent judgment as to the second issue presented whether acceptance of domestic satellite authorization constituted a waiver of any rights under the contracts I cannot agree with the FCC's decision. As previously stated, pp. 357-358, supra, the FCC concluded that Western Union had waived its rights, if any existed, under the Bell-Western Union contracts in accepting its satellite authorization. In reaching this determination the Commission relied upon the condition in the Western Union satellite authorization that the facilities be operated in accordance with the Second Report and Order, 35 F.C.C.2d 844 (1972) and "all rules and policies subsequently made applicable to domestic satellite communications." Thereafter the FCC decided that tariffs were the "most appropriate means" to achieve the availability of facilities on non-discriminatory terms. Based upon Western Union's conditional grant, the Commission concluded that it had "willingly and knowingly accepted (its) . . . domestic satellite authorizations subject to the explicit condition that tariffs, not private contracts" would apply to interconnection facilities. 49 F.C.C.2d at 323.
 
 
 75
 In denying reconsideration of the October 16, 1974 domestic satellite communication decision, the Commission altered its analysis. Although still relying upon the conditional satellite authorization, the Commission stated:
 
 
 76
 As to whether such condition placed Western Union on actual notice of the nature of the interconnection requirement we find it difficult to believe that as an established common carrier Western Union would not anticipate, either at the time of our Second Report and Reconsideration Orders or at the time its authorization was granted, that we might reach the determination after appropriate consideration of AT&T's applications and interconnection proposal that tariffs, rather than private contracts, would be the most appropriate means to assure the realization of our access and interconnection policy objectives which stressed the goal of "reasonable and non-discriminatory" interconnection. In light of the foregoing and Section 203 of the Communications Act, we deem Western Union's claim of lack of notice to be untenable.
 
 
 77
 53 F.C.C.2d at 1054. This shift, from concluding that Western Union "willingly and knowingly" accepted its authorization subject to tariffs to concluding that Western Union must have "anticipate(d)" the tariff policy, in and of itself suggests the slippery quality of the FCC's reasoning. Moreover, when the FCC decisions concerning domestic satellite communications are read in light of Western Union's satellite authorization, I believe the commission's finding of a knowing and voluntary waiver cannot be sustained.
 
 
 78
 The Commission's Second Report and Order, 35 F.C.C.2d 844 (1972), provides the starting point for analyzing the issue presented here. There the Commission stated with respect to domestic satellite communications:
 
 
 79
 . . . we will require existing terrestrial carriers seeking domestic satellite authorizations to submit for commission approval, prior to action on their applications, a description of the kinds of interconnection arrangements they will make available to other satellite systems and/or earth station licensees . . .
 
 
 80
 35 F.C.C.2d at 856. This policy was designed to accomplish the Commission's "objective of assuring that all carriers providing retail interstate services . . . have access at non-discriminatory terms and conditions to local loop and interchange facilities as necessary for the purpose of originating and terminating such interstate services to their customers." Id.
 
 
 81
 Thereafter, Western Union applied for satellite communication authorization. The FCC granted Western Union the right to construct three satellites subject to certain terms and conditions. As specified in that order the Commission required that "these facilities should be operated in accordance with all Commission policies adopted in Docket No. 16495 (Second Report and Order ) and all rules and policies subsequently made applicable to domestic satellite communications." Western Union Telegraph Co., 38 F.C.C.2d 1197, 1199 (1973).
 
 
 82
 The Commission's major policy pronouncement with respect to satellite communications came one year after the Second Report and Order in the grant of satellite authorization to AT&T. In this proceeding the FCC rejected AT&T's proposal that it furnish interconnection facilities to other satellite service carriers, "on a negotiated contract basis." American Telephone & Telegraph Co., 42 F.C.C.2d 654 (1973). Instead the Commission determined that "the filing of tariff schedules rather than the negotiation of private contracts is the most appropriate means by which to achieve our objective that these facilities shall be provided to other satellite carriers on 'reasonable and non-discriminatory conditions.' " Id. at 659.
 
 
 83
 The question presented here is whether Western Union, in accepting its satellite authorization, waived any rights that might exist under the Bell-Western Union contracts and consequently became bound by the tariff rate. In accepting the satellite authorization, Western Union became subject to the Commission's general policies with respect to satellite communication set forth in the Second Report and Order, 35 F.C.C.2d 844 (1972). In this report the Commission sought to ensure satellite communication carriers "access at non-discriminatory terms and conditions to local loop and interchange facilities . . . ." Id. at 856. However, the Commission did not express any opinion as to whether contract or tariff rates should govern the lease of such facilities.
 
 
 84
 Nor should Western Union have assumed that only tariff rates would be consistent with non-discriminatory terms. For the leasing of interconnection facilities under contracts as well as tariffs had long been an accepted practice in the communications industry, a practice which this Court subsequently upheld in Bell Telephone Co. of Pennsylvania v. F.C.C., supra.
 
 
 85
 Thus, nothing in the Second Report announced in 1972 apprised Western Union that its acceptance of satellite authorization was in any way conditioned upon abandonment of its rights under the Bell-Western Union contracts.
 
 
 86
 Moreover, Western Union's satellite authorization was granted on the further condition that the facilities "be operated in accordance with . . . all rules and policies subsequently made applicable to domestic satellite communications . . . ." (Emphasis added.) The question then presented is whether acceptance of authorization under such terms constituted a ". . . voluntary or intentional relinquishment of a known right." Royal Air Properties, Inc. v. Smith, 333 F.2d 568, 571 (9th Cir. 1964). The grant by its terms refers only to the operations of facilities used in satellite communications ; it makes no reference to existing interconnection rights of Western Union, a significant matter which the majority has seen fit to ignore. Thus, there is no basis in the language to conclude that Western Union's acceptance of this grant constituted a "voluntary or intentional" abandonment of any rights that might exist under the Bell-Western Union contracts.
 
 
 87
 Consequently, I would hold that the Commission erred in concluding that Western Union waived any existing rights to interconnection facilities under the Bell contracts. Such a holding necessarily obviates any consideration on my part of Western Union's second argument that the conditional grant of satellite authorization constituted an unlawful expansion of the Commission's regulatory powers.
 
 IV.
 
 88
 Based upon a de novo review of the two legal issues presented, I believe the FCC erred in its interpretation of the Bell-Western Union contracts and the Western Union domestic satellite authorization. Accordingly, I dissent and would grant the petition for review which the majority has denied.
 
 
 
 [1]
 Foreign exchange (FX) is a private line service that is partially "switched". It allows a businessman located in one state, to, in effect, maintain a local phone in another state. Under FX, for example, a businessman in Washington can be reached by telephone subscribers in New York City and can himself reach New York City telephone subscribers (through a local loop in Washington, a Washington-New York interexchange line, and a business line in the New York City exchange area). However, New York City telephone subscribers could not reach Washington subscribers other than the Washington businessman over FX private line service and the latter would have to maintain a separate telephone in order to tie into the Washington exchange area. A Common Control Switching Arrangement (CCSA) is a private line system for linking the various offices of a large company through large switches on a local telephone company's premises instead of through PBX switches on the customer's premises
 
 
 [46]
 F.C.C.2d 413, 418 n.5, aff'd sub nom. Bell Telephone Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975). Reference may be had to previous decisions in this matter for definitions of other technical or peculiar terms. In the interest of simplicity, definitional material here will be minimal
 
 
 [2]
 5 U.S.C. § 706. Scope of review
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. . . .
 
 
 [3]
 (b) Connection of Leased Circuits
 Circuits leased to the Telegraph Company hereunder, or interexchange circuits of the Telegraph Company when connected to such leased circuits, may be directly connected with circuits owned by:
 (1) Other telephone companies offering a general telephone service to the public within the continental United States.
 (2) The United States Government on military bases, and on reservations of the National Aeronautics and Space Administration.
 (3) Electric power, or oil, oil products, or natural gas pipeline companies, or railroad companies where the circuits of such companies are provided primarily to communicate with points located along a right-of-way owned or controlled by such company.
 (4) Telegraph Companies offering international telegraph service under filed tariffs, where such circuits are used exclusively in international service and connection is made at terminals within the United States of such circuits.
 (5) Telegraph or telephone companies, or government-operated telegraph or telephone systems, operating in companies bordering the continental United States, where such circuits are used exclusively in furnishing service between such countries and the continental United States, and connection is made at terminals within the United States of such circuits.
 Any other direct connection of such circuits with circuits of others or of the Telephone Company shall be made only with the written approval of the Telephone Company.
 
 
 [53]
 F.C.C.2d at 1048
 
 
 [4]
 (d) Connection of Western Union Private Lines Services With Telephone Company Services
 Connection of Western Union private line services with Telephone Company services shall be allowed only under the tariffs of the Telephone Company and consistent with the terms and conditions of such tariffs applicable to the connection of Western Union provided services with services of the Telephone Company. No such connection shall at any time be made in any jurisdiction except as duly authorized by tariffs in force and effect.
 
 
 [53]
 F.C.C.2d at 1047. The Commission was aware that section 3(d) appears only in Contract No. 1, applicable to leasing within exchange areas, and not in Contract No. 2, applicable to leasing between exchange areas. WU mentions this variance by way of disparaging reliance on section 3(d), but makes no argument that the contracts ought to be separately construed as regards FX, CCSA, or domestic satellite services. (Petitioner's Brief at 20.)
 
 
 [5]
 According to WU, the "facilities" available under the contracts are "wire pair and microwave circuits, certain items of telephone equipment, and duct and pole line attachment space." (Petitioner's Brief at 16.) Again according to WU, "Telephone Company services" referred to in the contracts are "exchange switching (in the case of FX) and CCSA switching (in the case of CCSA)." (Petitioner's Brief at 21.) In addition, a "private line service", like FX, "provides the large-scale telephone customer with full-time private circuits for the transmission of communications between locations specified by the customer. The service operates to give the customer continuous communication without requiring the carrier to establish a new connection for each call or message." Bell Telephone Co. v. FCC, supra, 503 F.2d at 1254 n.3
 
 
 [6]
 We see no reason why tariffs should not be filed by the Bell System to cover facilities supplied to satellite licensees. The statutory requirement under our Act for filing of tariffs is based upon the national public interest in securing uniformity of treatment to all, to suppress unjust discrimination and undue preferences, and to prevent special and secret agreements, in respect to interstate wire and radio communications, and to that end to require that rates applicable thereto be established in a manner calculated to give them publicity, to make them inflexible while in force, and to cause them to be unalterable except in a manner prescribed by statute
 
 
 [21]
 Accordingly, we shall impose as a condition to the grant herein of the AT&T applications that all charges, classifications, regulations and practices applicable to the provision by the Bell System companies of interconnection facilities shall be set forth in tariff schedules to be filed pursuant to Section 203 of the Act and Part 61 of our Rules
 
 
 [42]
 F.C.C.2d 654, 659-60 (1973)
 
 
 [7]
 An attempt to initiate this proceeding in the district court would probably have resulted in a reference to the FCC under the doctrine of primary jurisdiction. "Under the doctrine, a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise." MCI Communications Corp. v. AT&T, 496 F.2d 214, 220 (3d Cir. 1974)
 
 
 [8]
 WU also argues that the FCC's reference to 1970 tariffs in interpreting the contracts will have the "preposterous consequences" that all provisions of such tariffs "would be frozen as of that date for the life of the contract." (Petitioner's Brief at 25.) We fail to see the logic of this argument. There is no apparent logical connection between the Commission's reference to 1970 tariffs as part of the process of construing these private exchange of facilities contracts, and the statement that all provisions of the tariffs will be frozen. If there is a logical connection, it escapes our powers of discernment
 
 
 [9]
 (d) Access and connection to a circuit section furnished hereunder may be had at points of termination of such circuit section only by means of local terminal circuits procured from the lessor or from its connecting telephone company by separate agreement, or by connections made by the lessee upon special approval by the lessor
 (App. at 0111.)
 
 
 [10]
 (g) This Agreement does not apply to the furnishing by either party to the other of any telephone or telegraph services or facilities under published tariffs
 (App. at 0087.)
 
 
 [11]
 Our interpretation of the contracts is further buttressed by the affidavits submitted by both parties in an attempt to explain each party's intentions at the time of contracting. AT&T affirmatively states that "(d) uring the negotiations, and in the execution of the contracts, it was not contemplated by those representing the Bell System that the contracts covered connection of Bell System services or facilities with Western Union services or facilities for FX or CCSA services, or that facilities would be furnished to Western Union under the contracts for such purposes." On the other hand, Western Union did not state that, at the time of negotiations, it was intended that facilities obtained under the contracts could be used for FX or CCSA services or any other Western Union services which required connection to Bell System services and which were not already allowed by tariffs in effect at the time of the signing. Rather Western Union merely states that at no time prior to the execution of the contracts did AT&T inform Western Union that the contracts did not cover leasing of Bell System facilities to Western Union for FX or CCSA services. Thus the intentions of the parties at the time of contracting, as shown by the affidavits of the parties, was that contract facilities could not be used for FX and CCSA services
 
 
 [53]
 F.C.C.2d at 1051 n. 12
 
 
 [12]
 Referring to the parol evidence rule, Professor Thayer said: "Few things are darker than this, or fuller of subtle difficulties." Thayer, A Preliminary Treatise on Evidence at Common Law 390 (1898). See, e. g., United States v. Clementon Sewerage Authority, 365 F.2d 609, 613-14 (3d Cir. 1966)
 
 
 [13]
 "If these words mean what they say, an agency whose action is subject to this provision cannot commit error by admitting particular evidence, no matter how incompetent or irrelevant the evidence may be." K. Davis, Administrative Law Treatise § 14.08, at 282 (1958)
 
 
 [14]
 We recognize that the parol evidence rule is frequently said to be a rule of substantive law and not a rule of evidence. E. g., United States v. Clementon Sewerage Authority, supra note 12, 365 F.2d at 613; J. Calamari & J. Perillo, The Law of Contracts § 43, at 86 (1970). No reason is apparent why the FCC could not apply the rule as a matter of substantive law or policy, if it chose to do so, but we hardly imagine that it is required to do so in view of the plain language of § 556(d) that "(a)ny oral or documentary evidence may be received."
 
 
 [15]
 The Commission is cognizant that if the contract rates do apply a disparity in treatment among carriers will exist. Such a disparity, if unjustified, would be manifestly contradictory to the Commission's often enunciated policy of fair and full competition and its policy that tariffs, rather than contracts, should generally govern these matters. Because of this the Commission intends to strictly construe the Bell-Western Union contracts
 
 
 [49]
 F.C.C.2d at 322
 
 
 [16]
 "When an applicant accepts a government permit which is subject to certain conditions, he cannot later assert alleged rights which the permit required him to surrender in order to receive it." Capital Telephone Co. v. FCC, 162 U.S.App.D.C. 192, 498 F.2d 734, 740 (1974)
 
 
 [1]
 See Bell Telephone Co. of Pennsylvania v. F.C.C., 503 F.2d at 1254 n.3, where this Court stated:
 A "specialized" common carrier is a carrier that does not provide the full range of communications services contemplated by the Communications Act, 47 U.S.C. § 151 et seq. For the purposes of this opinion, the phrase "specialized common carrier" shall refer to carriers who specialize in "private line services."
 "Private line service" provides the large-scale telephone customer with full-time private circuits for the transmission of communications between locations specified by the customer. The service operates to give the customer continuous communication without requiring the carrier to establish a new connection for each call or message.
 
 
 [2]
 See Majority Op. at n.1
 
 
 [11]
 E g., Meighan v. Finn, 146 F.2d 594 (2nd Cir. 1944), affirmed 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624 (1945); United Artists Corporation v. Strand Productions, 216 F.2d 305 (9th Cir. 1954); Ludwig Honold Manufacturing Company v. Fletcher, 405 F.2d 1123 (3rd Cir. 1969); Gillentine v. McKeand, 426 F.2d 717 (1st Cir. 1970); see also 17A C.J.S. Contracts § 297; Williston, Ch. 22, § 619; Restatement of Contracts § 236
 
 
 [3]
 Although the Supreme Court affirmed this Court's standard of review, it reached a different interpretation of the contract clause at issue. Hence the Supreme Court reversed this Court's decision on the merits